**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In re:                                                                     Case No. 25-43219

Andrea O'Halloran,

     Debtor.                                                          Chapter 7

**MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS**

Before the Court is the United States Trustee's ("<u>UST</u>") motion to dismiss this chapter 7 case for abuse under Section 707(b)(1) of the Bankruptcy Code (11 U.S.C. § 707(b)(1)). The UST argues that abuse arises under the totality of the circumstances under Section 707(b)(3)(B) because the Debtor earns sufficient monthly net income to repay a substantial portion of her debts in a chapter 13 plan. The Debtor counters that she has only recently become employed after a sustained period of unemployment, and that her income remains unstable. The Debtor further claims that anticipated decreases in monthly income and increases for household expenses will eliminate most of her disposable income, including: (1) necessary home repair costs; (2) maximizing retirement contributions to replenish savings drawn upon during her unemployment; and (3) future college tuition and related transportation expenses for her daughter.

The parties stipulated to many of the background facts. <u>See</u>, Doc. No. 31. An evidentiary hearing was held on April 28, 2026, at which only the Debtor testified.

The Court has jurisdiction and the authority to decide this matter under 28 U.S.C. §§ 1334(a) & (b); 28 U.S.C. §§ 157(a) & (b)(1); 28 U.S.C. § 151, and Local Rule 1070-1. This is a contested matter under Federal Rule of Bankruptcy Procedure 9014.

1

Based on the record, the Court makes the following findings pursuant to Federal Rules of Bankruptcy Procedure 9014 and 7052, incorporating Federal Rule of Civil Procedure 52.

**<u>FINDINGS OF FACT</u>**

The Debtor has a bachelor's degree in math and English, is 42 years old, and is a single parent to one teenage dependent. Her ex-husband lives abroad and does not contribute to household expenses or pay any child support. The Debtor became engaged a second time in 2014 and lived with her fiancé and shared expenses until his unexpected death in 2018. From that point forward Debtor again became solely responsible for household expenses, which prevented her from accumulating meaningful personal savings.

Overall, the Debtor's employment history has been relatively stable. From March 2014 through July 31, 2023, Debtor worked in product development for CVS Health. On or about July 31, 2023, Debtor lost her job due to downsizing, and not because of job performance.

The Debtor did not regain full employment for approximately two years, resulting in financial distress. The Debtor received approximately $23,000 in unemployment income in 2024. She supplemented these benefits by withdrawing approximately $70,000 from her 401(k) account, paying a premature withdrawal penalty of $7,500. In January 2025, Debtor qualified for governmental food assistance SNAP benefits. The Debtor also received assistance from family members. The Debtor exhausted her financial resources to preserve her home and avoid bankruptcy.

During her unemployment, the Debtor submitted between 800 and 1,000 job applications and unsuccessfully participated in over two hundred interviews. Finding replacement employment became challenging because the availability of remote work for her type of position significantly strengthened the candidate pool competing with her. Beginning in March 2025, the Debtor located

2

part-time employment earning $18.36 per hour and working between 22 and 28 hours per pay period. On May 5, 2025, she regained full employment with BlueCross BlueShield of Minnesota ("BCBS").

Notwithstanding improved salary and benefits from BCBS, the debts incurred and accruing during her unemployment forced her to file bankruptcy on September 29, 2025. The Debtor's bankruptcy Schedule F estimates general unsecured claims of $134,969.62, which are primarily consumer debts.

The Debtor's Schedule I lists gross monthly wages, salary and commissions as $11,083.35,[1] with monthly income after withholdings and other deductions of $7,445.38. Under Schedule J, she claims monthly household expenses of $4,907.82, leaving a monthly net income of $2,537.56. According to the UST, this monthly net income will repay more than 100% of the general unsecured claims through a 60-month chapter 13 plan.[2]

While the Debtor acknowledges that BCBS has provided a very positive employment experience and a high income, she fears industry changes threaten the stability of her position. The Debtor provided two press releases from the Office of Minnesota Governor Tim Walz and Lt.

---

[1]      For means test purposes, the Debtor listed her current monthly income on Official Form 122-1 as $7,172.88, which is a calculation of her average gross monthly income for the six months prior to bankruptcy. See, 11 U.S.C. § 101(10A). Her current monthly income was below the median income in Minnesota for a household of two. Thus, as a below-median income debtor, she is not subject to the means test and presumption of abuse under Section 707(b)(1). See, 11 U.S.C. § 707(b)(7).  A variance between her Schedule I gross income and gross income under the means test arises because she had been underemployed for a portion of the six months prior to the petition date. Her actual salary at the time of the bankruptcy filing was therefore not fully counted under the means test using the Code's definition of current monthly income. On June 15, 2026, the Court notified the parties that it intended to take judicial notice of the fact that the Debtor was a below-median income debtor based on her Form 122-1. See, Doc. No. 37. Neither party objected.

[2]      The UST estimates repayment of the Debtor's creditors through a 60-month plan. As a below-median income debtor, the Debtor's applicable commitment period (based on her current monthly income) only requires a 36-month plan. See, 11 U.S.C. § 1325(b)(4)(A).

Governor Peggy Flanagan outlining proposals to move administration of Medicaid away from Managed Care Organizations to a single statewide Administrative Service Organization. Ex. A and Ex. B, see also, https://mn.gov/governor/newsroom/press-releases/?id=1055-730514 (Posted March 10, 2026.  Last accessed June 1, 2026). The Debtor testified that this proposal would likely reduce her existing job responsibilities at BCBS by approximately 50 percent. The President of BCBS promptly sent an email to employees (Ex. C) to allay fears and reassure them that "the Governor's proposal is just that—a recommendation." The e-mail further indicated that the proposal would require "the creation of new laws" meaning "multiple rounds of legislative hearings, debates and rounds of voting." The Debtor did not provide any evidence that the Governor's proposal has made any tangible progress towards actual legislation or regulation.

The Debtor further states that imminent increases to her household expenses will consume her monthly net income. First, the Debtor testified that household maintenance and repair costs to her more than 100-year-old house typically exceed her budget. Currently, the Debtor's water heater needs replacement, and her family has lacked hot water since 2024. The Debtor obtained estimates for immediate replacement of the water heater and related improvements totaling $18,380.18 (Ex. 3 and Ex. F).[3]  This replacement cost would increase her normal monthly housing repair and maintenance cost from $150.00 to $1,681.70 for 12 months, reducing the Debtor's monthly net

---

[3]     The written estimate for the water heater replacement of $15,768.43 includes a replacement cost for the water heater of $2,444.48, and additional costs for installation of a new toilet, an iron filter, a water softener, sediment filter, and other miscellaneous charges. The UST did not challenge the necessity or reasonableness of any of these items, and the Court will not second-guess the Debtor's cost-benefit analysis on the scope of the proposed repairs. At trial, the Debtor further clarified that the estimate included a "member savings" discount that would not apply, thus increasing the estimate to at least $17,248.89. The stipulation of facts also refers to replacement of a sewer line for $1,131.29, but Exhibit E shows replacement to the sewer line occurred in 2022. Exhibit F shows instead an estimate for HVAC maintenance of $1,131.29, to bring the special repair and maintenance charges to $18,380.18.

income for the first year of a hypothetical chapter 13 plan to $764.74. The UST does not contest the reasonableness of this expense.[4]

Second, once she replaces the water heater, the Debtor intends to increase her voluntary retirement contributions to replenish withdrawals taken during her unemployment. She estimates that by increasing her monthly contributions from $849.74[5] to $2,041.66 (the maximum allowed by law for a participant under the age of 50), she can restore her retirement savings to pre-unemployment levels within five to seven years. These increased contributions would reduce her monthly net income to $1,381.70, starting in the second year of a hypothetical chapter 13 plan.

The Debtor's pay stubs filed with her bankruptcy petition show that in the sixty days prior to bankruptcy she had been making bi-weekly contributions to her 401(k) in the amount of $255.77. The Court therefore finds that the Debtor's monthly retirement contributions on the petition date totaled $554.17 (i.e., $255.77/2 *4.33333 weeks per month).

The UST argues that the Debtor may not contribute more than the amount necessary to maximize her employer's matching contribution at 5.0% of her gross salary, which the UST indicates also equates to $555.00 per month. The UST calculates that the Debtor's monthly net income after she completes her water heater replacement is $2,284.18, which would provide full repayment of her unsecured claims in a chapter 13 plan.

In addition to increasing her retirement contributions, the Debtor intends to use any remaining monthly net income to pay a portion of her daughter's college tuition and transportation

---

[4]     Initially, the UST argued that the Debtor should amortize the repairs over a 60-month period but concluded her trial brief by accepting the Debtor's 12-month alternative.

[5]     The deduction for retirement contributions of $849.74 on the Debtor's Schedule I does not reflect the amount of her contributions in advance of the petition date, but her desired contribution level after filing the bankruptcy.

expenses beginning in the fall of 2027. The Debtor estimates that tuition and commuting costs range from $29,500 to $31,000 annually (Ex. I) which would absorb all remaining monthly net income, leaving her with $0.00 to contribute as disposable income for payment to unsecured creditors in a hypothetical chapter 13 plan. The UST asserts that tuition and related support expenses for an adult child are not reasonable as a matter of law and the Debtor's disposable income payable in a hypothetical chapter 13 plan remains at $2,284.18 per month.

### <u>CONCLUSIONS OF LAW AND DISCUSSION</u>

A motion to dismiss for abuse arises under 11 U.S.C. § 707(b)(1), which provides:

> After notice and a hearing, the court, on its own motion or on a
> motion by the United States trustee, . . . may dismiss a case filed by
> an individual debtor under this chapter whose debts are primarily
> consumer debts, or, with the debtor's consent, convert such a case
> to a case under chapter 11 or 13 of this title, if it finds that the
> granting of relief would be an abuse of the provisions of this chapter.

Subparts of Section 707(b) provide three alternatives for considering potential abuse: (1) applying the means test; (2) considering the Debtor's bad faith; or (3) if the "totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." <u>See</u>, 11 U.S.C. §§ 707(b)(2), 707(b)(3)(A), and 707(b)(3)(B). In this case, the UST requests dismissal for abuse due to the totality of circumstances under Section 707(b)(3)(B), which Congress added to the Code as part of the Bankruptcy Abuse Prevention and Consumer Protection Act in 2005 ("<u>BAPCPA</u>"). The UST bears the burden of proof to establish abuse. <u>In re Ansar</u>, 383 B.R. 344, 348 (Bankr. D. Minn. 2008). The parties stipulate that the debts in this case are primarily consumer debts.

The totality of the circumstances test in BAPCPA codified caselaw that permitted dismissal of chapter 7 cases for substantial abuse[6] when a debtor appeared to have the ability to repay a

---

[6]     Prior to BAPCPA, Section 707(b) permitted dismissal based upon substantial abuse with a presumption of non-abuse in favor of a debtor. 11 U.S.C. § 707(b) (2004). BAPCPA rewrote

substantial portion of unsecured debt through a hypothetical chapter 13 plan. In re Walton, 866 F.2d 981, 984-85 (8th Cir. 1989); U.S. Trustee v. Harris, 960 F.2d 74, 76-77 (8th Cir. 1992); Fonder v. U.S., 974 F.2d 996, 999-1000 (8th Cir. 1992); In re Koch, 109 F.3d 1285, 1286 (8th Cir. 1997); see also, In re Boatright, 414 B.R. 526,530 (Bankr. W.D. Mo. 2009) (finding that the pre-BAPCPA ad hoc "substantial abuse" analysis was codified under the totality of the circumstances test in Section 707(b)(3)).

The ability to repay unsecured debts remains the primary consideration when determining when abuse arises under the totality of the circumstances, and courts have largely adhered to the standards by the pre-BAPCPA Eighth Circuit decisions cited above. See, In re Honkomp, 416 B.R. 647, 649 (Bankr. N.D. Iowa 2009), citing, In re Booker, 399 B.R. 662, 667 (Bankr. W.D. Mo. 2009); In re Budig, 387 B.R. 12, 16 (Bankr. N.D. Iowa 2008) (actual ability to pay is an important, if not primary consideration).

Projecting a debtor's ability to repay his or her debts under the totality of circumstances test requires consideration of the reasonableness of deductions to the debtor's gross income and the debtor's expenses. In re Smith, 447 B.R. 832, 834 (Bankr. N.D. Ohio 2011) (stating that a court should scrutinize and "make downward adjustments" to expenses to "ensure that [they] are reasonable."); Booker, 399 B.R. at 668 (stating that courts expect that "the current monthly expenses of debtors seeking a discharge under Chapter 7 should show some evidence of 'belt tightening'"). Because the Debtor is a below median income earner, calculating projected disposable income under a chapter 13 plan would consider the reasonableness of her actual income

---

Section 707(b) to dilute the standard for dismissal from "substantial abuse" to "abuse", eliminated the presumption of non-abuse, and created the three alternative paths: the means test; bad faith; and totality of the circumstances. Pub. L. No. 109-8, § 102(a), 119 Stat. 23, 27 (2005).

and expenses versus using the IRS standards for certain expenses under the means test. 11 U.S.C. §§ 1325(b)(1) and 1325(b)(3); see also, In re Bruce, 484 B.R. 387, 390 (Bankr. W.D. Wash. 2012).[7]

After estimating a projected disposable income based on the Debtor's income and reasonable expenses, the Court must decide if any resulting hypothetical chapter 13 plan would result in substantial repayment to the debtor's unsecured creditors. In re Ellison, 663 B.R. 743, 749-750 (Bankr. E.D. Mo. 2024). Bankruptcy courts in the Eighth Circuit prior to and after BAPCPA have consistently found substantial abuse or abuse even when the projected repayment would provide a recovery to general unsecured creditors as low as 20 to 30 percent of their total estimated claims. In re Wilkins, 1997 WL 1047545, at *5 (Bankr. D. Minn. 1997) (finding substantial abuse where a hypothetical chapter 13 plan could pay 28% of unsecured claims over three years or 49% over five years); Booker, 399 B.R. at 671 (finding abuse where debtor could make 36.8%, repayment to general unsecured creditors); Ellison, 663 B.R. at 749 (finding that a hypothetical repayment of 21% to general unsecured creditors constituted substantial repayment).

While the ability to substantially pay unsecured debt through a chapter 13 plan is the primary consideration in the Eighth Circuit, some courts have listed a broader set of factors under the totality of the circumstances, including:

> whether the bankruptcy filing was precipitated by an unforeseen catastrophic event, such as a sudden illness or unemployment; whether the debtor is eligible for relief under another chapter; whether there are non-bankruptcy remedies available to the debtor; whether the debtor can obtain relief through private negotiations; whether the debtor's proposed budget is excessive or unreasonable; whether the debtor has a stable source of future income; whether the debtor could provide a meaningful distribution in a Chapter 13 case; and whether the debtors' expenses could be reduced significantly without depriving them and their dependents of necessities.

---

[7]   While both the means test and the totality of circumstances standard examine the debtor's ability to repay unsecured debts, the calculations under the means test use fixed limits for certain expenses. The totality of the circumstances test affords the "court with greater flexibility to ascertain a debtor's true current financial condition." Boatright, 414 B.R. at 530.

8

Honkomp, 416 B.R. at 649-650.

1. **Resolving Disputed Income and Expense Issues for Calculating Projected Disposable Income in a Hypothetical Chapter 13 Plan.**

In calculating a projected monthly disposable income for a hypothetical chapter 13 plan, the parties dispute two issues: the Debtor's proposed increase of retirement contributions, and Debtor's intent to pay her daughter's future college tuition and related commuting expenses.

*Calculation of Monthly Income – Resolving the Amount of Retirement Contributions*

The first issue is the calculation of the Debtor's monthly income, which requires resolving a dispute over the retirement contributions the Debtor could make during a chapter 13 plan. The Debtor argues that she may increase her current monthly contributions from $555.00 to $2,041.66, starting in year two of a chapter 13 plan. The UST argues that the Debtor is limited to her current contributions of $555.00 per month.

This question continues to generate disagreement among the courts. The applicable provision of the Code at issue is Section 541(b)(7), which provides that:

> (b) Property of the estate does not include . . . (7) any amount—
>
> > (A) withheld by an employer from the wages of employees for payment as contributions— (i) to—(I) [an ERISA-qualified plan, such as a 401(k)] . . . except that such amount under this subparagraph shall not constitute disposable income, as defined in section 1325(b)(2); or . . .
> >
> > (B) received by an employer from employees for payment as contributions—(i) to— (I) [an ERISA-qualified plan, such as a 401(k)] . . . except that such amount under this subparagraph shall not constitute disposable income, as defined in section 1325(b)(2);

Courts have run the gamut in interpreting this language with four divergent outcomes: (1) disallowance of any contributions during a chapter 13 plan; (2) allowance of contributions during a chapter 13 plan up to the maximum permitted under non-bankruptcy law—subject only to the

9

debtor's good faith; (3) permitting contributions in the amount made by the debtor preceding the petition date; and (4) permitting contributions in the amount made by the debtor preceding the petition date determined by averaging the debtor's contributions for the six months prior to filing bankruptcy. See, In re Saldana, 122 F.4th 333, 341-345 (9th Cir. 2024) (discussing competing approaches).

The issue has caused a recent split between two United States Courts of Appeals. In re Davis, 960 F.3d 346, 357 (6th Cir. 2020) (holding that a debtor can exclude monthly 401(k) contributions from disposable income "so long as those contributions were regularly withheld from the debtor's wages prior to her bankruptcy."); Saldana, 122 F.4th at 345 (stating that "the Bankruptcy Code does not provide any basis to limit the amount of voluntary retirement contributions a debtor can exclude to their prepetition contribution amount.").

The Eighth Circuit has not addressed this issue. The parties did not provide any information as to the current local practice. There is a single published decision in this district holding that a debtor may continue making voluntary retirement contributions to an ERISA-qualified plan, such as a 401(k), to the extent the proposed contributions align with the amounts the debtor regularly made prepetition. In re Melander, 506 B.R. 855, 868 (Bankr. D. Minn. 2014) (holding that the debtor could continue making contributions at the level that she had made for 14 years prior to filing bankruptcy),[8] citing, In re Seafort, 669 F.3d 662, 667-668 (6th Cir. 2012) (stating that the majority view is that the "the debtor may continue making voluntary contributions in the same

---

[8]     While Melander applied this rule to an above median debtor, the same analysis would hold as to a below median debtor, as Section 541(b)(7) and Section 1325(b)(1) would apply in both instances. See also, In re Devilliers, 358 B.R. 849, 859 n.24 (Bankr. E.D. La. 2007) (stating that there is no difference between an above or below median debtor with respect to voluntary retirement contributions).

amount he or she was contributing at the time of filing."); In re Drapeau, 485 B.R. 29, 38-39 (Bankr. D. Mass. 2013) (finding that the debtor's post-petition voluntary retirement contributions must be shown to be made in good faith, which "will often turn on whether a debtor has made contributions in similar amounts over an extended period of time."); In re Jensen 496 B.R. 615, 621 (Bankr. D. Utah 2013) (holding that "voluntary retirement contributions being made as of the date of petition do not constitute disposable income and debtors may continue making those contributions during the life of the plan.").

The Court sees no reason to depart from Melander, despite the continued disagreement among courts. For a Section 707(b) motion, the Court believes it should proceed in formulating a hypothetical chapter 13 plan based on existing law and practice, and without making any major changes to the law, particularly since the standing chapter 13 trustee is not part of this proceeding.

Further, even if the Debtor could increase her 401(k) contributions, her plan proposal remains subject to the good faith confirmation standard of Section 1325(a)(3). Although the recent Saldana decision held that Section 541(b)(7) excluded all voluntary retirement contributions from disposable income in a chapter 13 case, the Ninth Circuit nonetheless commented that such an approach "is not without limitation" and reaffirmed that "all Chapter 13 plans are subject to a good faith requirement." 122 F. 4th at 344; citing, Gorman v. Cantu, 713 Fed. App'x. 200, 202-203 (4th Cir. 2017) (affirming a bankruptcy court's exclusion of retirement contributions solely under a good faith standard, without directly addressing the interpretative split of Section 541(b)(7)); see also, Tara Twomey & Todd F. Maynes, Protecting Nest Eggs and Other Retirement Benefits in Bankruptcy, 90 Am. Bankr. L.J. 235, 262, n.167 (2016) (stating that courts that interpret Section 541(b)(7) to permit increased contributions "typically reserve the right to evaluate the plan under a good faith standard.").

11

Here, the Debtor proposes to nearly quadruple her current retirement contributions. She did not provide any evidence that she has ever maximized her retirement contributions as she here proposes. Thus, the Court finds for the present motion that the intent to maximize those contributions while proposing to pay nothing to creditors would not satisfy the good faith standard for plan confirmation. Therefore, in estimating her monthly income for a hypothetical chapter 13 plan, she is limited to the amount of her monthly retirement contributions as of the petition date.

In this case, the record shows that the Debtor made prepetition contributions to her 401(k) account at BCBS in the amount of $554.17 per month. This amount would remain excluded from the Debtor's projected disposable income in a hypothetical chapter 13 plan under Sections 541(b)(7) and 1325(b)(2). Thus, the Court finds that the Debtor's monthly income during the entire course of a hypothetical chapter 13 plan would be $7,740.12.

*Calculation of Reasonable Expenses – Tuition and Commuting Expenses for Adult Daughter*

For the first year of a hypothetical plan, the Court finds that the replacement of the water heater would increase monthly expenses to $7,190.60. Beginning in the second year of a hypothetical plan, monthly expenses would decrease to $5,148.94, and both parties appear to agree with this figure. The parties dispute whether the Debtor may then pay additional expenses for her adult daughter's college tuition and related commuting costs, thereby eliminating any monthly disposable income after the first year of a hypothetical plan.

Courts appear uniform in finding that expenses for supporting adult children and contributions to their college education are not reasonable, absent an established legal obligation to support the adult child as a dependent, such as by a court-ordered domestic support obligation. See, e.g., In re Schumacher, 495 B.R. 735, 742 (Bankr. W.D. Tex. 2013); In re Kubatka, 605 B.R. 339 (Bankr. W.D. Pa. 2019) (stating that "it is universally accepted that 'support for adult children

12

or contributions to their college education are generally not reasonable expenses in the context of section 707(b)(3)(B).'"); In re Hicks, 370 B.R. 919, 923 n.8 (Bankr. E.D. Mo. 2007) (noting that contributions to an adult child's education would support a finding of abuse under section 707(b)(3)(B)); In re Walker, 383 B.R. 830, 838 (Bankr. N.D. Ga. 2008) (holding that supporting college-aged children at the expense of unsecured creditors is not permissible); Compare, In re Maiorino, 435 B.R. 806, 808 (Bankr. D. Mass. 2010) (permitting deduction of contributions to college tuition when ordered as a domestic support obligation in a probate court judgment).

"Although a parent's aspiration to put his or her children through college is commendable, parents do not normally have a legal duty to do this. Debtors, however, have a legal duty to pay their creditors." Schumacher, 495 B.R. at 741–42, citing, In re Mastromarino, 197 B.R. 171, 178 (Bankr. D. Me. 1996). The bankruptcy system "is not designed to enable debtors to fund their adult children's college education at their creditors' expense." Schumacher, 495 B.R. at 742.

Local case law has likewise held that paying tuition and similar expenses for college-aged children are not reasonable for Section 707(b) purposes, or in calculating disposable income for a chapter 13 plan. See, Wilkins, 1997 WL 1047545 at *4 (holding that the debtor could not budget for support of her adult non-dependent children and that support payments to third parties is limited to those individuals for whom the debtor has a legal obligation to support); In re Gyurci, 95 B.R. 639, 643 (Bankr. D. Minn. 1989) (stating in a motion under Section 707(b) that the debtor could not pay for son's college tuition); In re McKee, BKY 99-33636, slip op. (Bankr. D. Minn., Nov. 23, 1999) (O'Brien, J.) (holding that a debtor's payment of loans, insurance costs, and maintenance expenses for automobiles for college-age sons was not reasonable or necessary).[9]

---

[9]   This is found at https://www.mnb.uscourts.gov/sites/mnb/files/opinions/mckee.ddo_.pdf.

This Court agrees that the Debtor cannot fairly or reasonably prioritize the funding of her daughter's college tuition and related commuting expenses to the detriment of the unsecured creditors, absent a binding legal obligation to do so under non-bankruptcy law, which has not been shown. Therefore, the Court finds that the reasonable monthly expenses to deduct from the Debtor's monthly income are in the amount of $6,680.64 for the first year of a hypothetical chapter 13 plan and in the amount of $5,148.94 for the remaining duration of the plan.

2. **Determining if the Debtor's Projected Disposable Income Would Result in Substantial Repayment of her General Unsecured Creditors.**

The Court must next consider whether the Debtor's estimated monthly disposable income would result in substantial repayment to her unsecured creditors in a hypothetical chapter 13 plan. As the Debtor's current monthly income is below the median income in Minnesota for her household size, it appears that she can convert her case and confirm a chapter 13 plan with a three-year commitment period. See, 11 U.S.C. § 1325(b)(1)(4) (providing that the applicable commitment period in a chapter 13 plan is three years if the debtor's current monthly income is below the median family income in the debtor's state); 11 U.S.C. § 101(10A)(A) (defining current monthly income as the average gross income from all sources during the six months prior to the last day of the calendar month before the commencement of the case) and 11 U.S.C. § 348(a) (providing that subject to certain exceptions not applicable here, the conversion of a case "does not effect a change in the date of the filing of the petition"); see also, In re Serna, 669 B.R. 206, 218-19, n.29 (Bankr. D. Kan. 2025) (applying a three-year commitment period to a hypothetical chapter 13 plan calculation for a below-median income debtor in a motion to dismiss under Section 707(b)(3)(B)).

Using the determined monthly income and expense figures, the Court projects a hypothetical chapter 13 plan repayment based on a three-year commitment period as follows:

14

| Plan Year | Monthly Income | Monthly Expenses | Monthly Net Income | Annualized Net Income |
|---|---|---|---|---|
| 1 | $7,740.12 | $6,680.64 | $1,059.48 | $12,713.76 |
| 2 | $7,740.12 | $5,148.94 | $2,591.18 | $31,094.17 |
| 3 | $7,740.12 | $5,148.94 | $2,591.18 | $31,094.17 |
| Total (3-year plan) | | | | $74,902.10 |

On the gross payments of $74,902.10, the standing chapter 13 trustee would receive a 10%

fee. 28 U.S.C. § 586(e)(1)(B)(i). The Court further estimates that the Debtor would likely incur

additional attorneys' fees and costs payable through the plan of approximately $5,000.00. These

estimated deductions would reduce the amounts payable under the hypothetical plan to general

unsecured creditors to $62,411.89, which constitutes 46.24% of her estimated general unsecured

claims of $134,969.62. The Court finds that this repayment capacity constitutes an ability to make

substantial repayment to the Debtor's general unsecured creditors.[10]

### 3. **Considering Other Circumstances.**

Although she appears to have the ability to substantially repay unsecured claims through a

chapter 13 plan, the Debtor argues special circumstances warrant denial of the UST's motion to

dismiss, primarily her recent unemployment and uncertainty with her current position. This

argument is the focal point of the Debtor's trial brief, where she requested that this Court "accord

significant weight to factors other than her ability to pay" and argued that her "actual ability to pay

is hamstrung by her need to recover from the financial disasters that led to her filing bankruptcy…"

See, Doc. No. 33 at 4 (emphasis added).

---

[10]     The Court calculates that a five-year plan would result in repayment to general unsecured
creditors of $118,381.40, or 87.71% of her claims.

15

Prior to BAPCPA, the Eighth Circuit held that a bankruptcy court may dismiss a case under the totality of the circumstances solely because the debtor could afford to pay unsecured creditors in a chapter 13 plan. See, Fonder, 974 F.2d at 999 (stating that the bankruptcy court correctly concluded that "'the ability to fund a chapter 13 plan can be sufficient reason to dismiss a chapter 7 petition under § 707(b)'"), quoting, Harris, 960 F.2d at 77.

The legislative history related to BAPCPA's codification of the totality of the circumstances test reinforces the pre-existing Eighth Circuit case law. Prior to BAPCPA, the Fourth Circuit rejected what it characterized as a per se test for substantial abuse based solely on the debtor's ability to repay his or her debts. In re Green, 934 F.2d 568, 572-573 (4th Cir. 1991). The court instead required the weighing of an additional five factors that in the court's view demonstrated the necessary substantial abuse by a debtor attempting to "take unfair advantage of his creditors":

> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment; (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay; (3) Whether the debtor's proposed family budget is excessive or unreasonable; (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and (5) Whether the petition was filed in good faith.

Id.

BAPCPA's legislative history expressly rejected Green, stating that:

> No inference should be drawn, however that by referencing the 'totality of the circumstances' Congress intended to approve the result in *In re Green*, 934 F.2d 568 (4th Cir. 1991) or similar cases. Such cases are rejected by the means test reforms and the change in the standard from "substantial abuse" to "abuse" in H.R. 2415.

16

146 Cong. Rec. S11700 (daily ed. Dec. 7, 2000).[11]

The legislative history describing the need to overhaul Section 707(b) criticized <u>Green</u>, indicating that it had been improperly relied upon by bankruptcy courts as "justification" for "ignoring ability to pay" and stated that other circuits, including the Eighth Circuit, had followed the original intent of Section 707(b) to "insist[] that debtors with ability to pay must do so." <u>Id</u>.

The Congressional Record instead spoke favorably of the approach applied by the First Circuit in <u>In re Lamanna</u>, 153 F.3d 1 (1st Cir. 1998), which, similar to the Eighth Circuit decisions in <u>Walton</u>, <u>Harris</u> and <u>Fonder,</u> endorsed giving primary weight to a debtor's ability to repay his or her debts in a hypothetical chapter 13 plan. <u>Id</u>.; <u>see</u> <u>also</u>, <u>Lamanna</u>, 153 F.3d at 4-5 (stating that in considering the totality of the circumstances "courts should regard the debtor's ability to repay out of future disposable income as the primary, but not necessarily conclusive, factor of 'substantial abuse'"). <u>Lammana</u> further joined the Eighth Circuit in finding that "a bankruptcy court may, but is not required to, find 'substantial abuse' if the debtor has an ability to repay, in light of all of the circumstances." 153 F.3d at 5.

The Eighth Circuit has since recognized "the clear congressional intent of BAPCPA, which was enacted 'to ensure that debtors repay creditors the maximum they can afford.'" <u>In re Frederickson</u>, 545 F.3d 652, 657 (8th Cir. 2008), <u>citing</u>, <u>In re Gonzalez</u>, 388 B.R. 292, 309 (Bank.S.D.Tex.2008), (<u>quoting</u> H.R. Rep. No. 109–31, pt. 1, at 2 (2005), U.S. Code Cong. & Admin. News 2005, pp. 88, 89).

In reviewing the legislative history, this Court may give some limited consideration to other factors, such as the Debtor's sudden prepetition unemployment. Such a circumstance could

---

[11]     Available at: https://www.congress.gov/congressional-record/volume-146/issue-150/senate-section/article/S11683-2

change the outcome of a motion to dismiss under Section 707(b)(3)(B) when the financial estimates otherwise show that a debtor's ability to substantially repay creditors is a borderline decision, or if the conditions that caused Debtor's prior unemployment persist such that there is a tangible doubt as to the Debtor's ability to remain employed during the course of a hypothetical plan. But to follow the Debtor's argument and "accord significant weight" to the distress arising from her prepetition unemployment, since resolved with her new employment at BCBS, would ignore the clear intent of Congress in revising Section 707(b)(3)(B), which followed this Circuit's precedent to apply near-decisive weight to a debtor's ability to pay unsecured claims under chapter 13. The Debtor also provides no support, and the Court cannot identify any from the caselaw or legislative history, for the proposition that the Debtor may prioritize restoring her financial position to its pre-distress status (i.e., by maximizing future retirement contributions) to the exclusion of any repayment to her unsecured creditors.

The Court believes that the Debtor's prepetition unemployment constituted a substantial hardship on her family and that any circumstance suggesting jeopardy to her current employment will reasonably cause physical and emotional stress for the Debtor. But deciding motions to dismiss for abuse by weighing the degree of each debtor's unique circumstances of prepetition hardship would lead to uneven results, an outcome the drafters of BAPCPA explicitly sought to lessen when revising Section 707(b). In re Cox, 393 B.R. 681, 693 (Bankr. W.D. Mo. 2008) (observing that in many respects BAPCPA was designed to limit the discretion of bankruptcy judges). The Congressional Record is clear on this point, stating that revised Section 707(b) "is intended to both remove unequivocally the bankruptcy court's discretion with regard to whether a debtor with ability to pay should be dismissed from chapter 7, and to restrict as much as possible reliance upon judicial discretion to determine the debtor's ability to pay." 146 Cong.

18

Rec. S11700 (further stating that "Congress thus intends that the new section 707(b) provide a tightly-focused mechanism for identifying bankrupts who have repayment capacity and sorting them out of Chapter 7, as well as dealing with other forms of abuse.").

Even courts that have referenced a debtor's prepetition unemployment as a factor under Section 707(b)(3)(C) have not afforded that circumstance controlling weight when the evidence otherwise shows a debtor can make substantial repayment to creditors through new employment. See, e.g., In re Crink, 402 B.R. 159, 175 (Bankr. M.D.N.C. 2009) (finding that the debtor's job loss two years before filing was not sufficiently sudden since the debtor had become re-employed with a strong salary five months prior to filing); In re Williams, 2011 WL 10468090, at *5 (Bankr. S.D. Iowa July 14, 2011) (observing that although the debtor experienced unemployment two years before filing, she had regained employment by the petition date and there was no indication that her employment would not continue); see also, In re Myers, 2009 WL 1456921, at *5 (Bankr. M.D.N.C. May 22, 2009) (finding that, although one debtor was unemployed at the time of the bankruptcy filing, the debtors' combined income had increased such that they could afford to pay $1,461 per month in a hypothetical plan for a dividend to unsecured creditors of 36%).[12]

Here, the Debtor has recovered full employment in advance of filing bankruptcy that has created meaningful monthly net income to substantially repay her unsecured creditors. She has

---

[12]   One court has further explained that a debtor suffering sudden unemployment is a favorable circumstance showing non-abuse because the debtor in such a situation had no control over his or her financial situation, which contrasts with a debtor who incurs debts with no intention to repay. In re Attanasio, 218 B.R. 180, 230 (Bankr. N.D. Ala. 1998) (discussing sudden unemployment and stating that "a debtor whose petition was filed because of an intention to incur debts without the ability to pay, should not be entitled to a Chapter 7 discharge"). Thus, the factor is not intended to weigh the degree of prepetition hardship experienced by the debtor, but whether the debtor bears any fault related to the incurrence of unpaid debts, which is the type of conduct that Green required bankruptcy courts in the Fourth Circuit to consider in its pre-BAPCPA formulation of substantial abuse. 934 F.2d at 572-573.

identified a potential political concern as to the security of her employment in the future but has not shown any actual proposed legislation in progress. It is therefore not a tangible enough risk to discount her current capacity for debt repayment in a hypothetical chapter 13 plan. In addition, a debtor in chapter 13 has a right of conversion to chapter 7 or a right to voluntarily dismiss her chapter 13 case at any time to respond to any unexpected downward changes to her income. See, 11 U.S.C. §§ 1307(a) and 1307(b). This should mitigate her concerns regarding job insecurity arising from politics.

Further, it appears that the Debtor would still benefit from her prepetition underemployment if she converted this case to chapter 13. The Bankruptcy Code's strict averaging of six months of prepetition income for the purposes of the means test would classify the Debtor as a below-median income debtor, thereby reducing her applicable commitment period under a chapter 13 plan from five years to three years. See, supra at fn.1 and 14-15. This greatly reduces her financial burdens to discharge her debts and places her in a more advantageous position relative to debtors who presently earn equivalent or even less income than she does but maintained consistent earnings during the six months prior to filing their petitions.

Finally, even if the Debtor's arguments in this case, including her desire to increase retirement contributions, had provided a justification to, at most, modestly discount her repayment potential in a hypothetical chapter 13 plan, the Court would nonetheless still find it abusive for the Debtor to use all her remaining disposable income to pay her adult daughter's future tuition and related transportation costs without repaying any amount to her unsecured creditors. See, In re Praleikas, 248 B.R. 140, 145 (Bankr. W.D. Mo. 2000) (providing that while the debtor's disposable income would pay only 20% of his unsecured debts, his proposed payment of most of that disposable income to pay his parents' unsecured loan constituted substantial abuse).

In summary, the other circumstances considered by the Court are insufficient to overcome the hypothetical chapter 13 plan calculations demonstrating that permitting the Debtor to proceed under a chapter 7 case would constitute abuse under Section 707(b)(3)(B). The UST has met her burden of proof in this matter.

IT IS ORDERED

1.     The UST's motion is granted and there are grounds to dismiss the case for abuse under 11 U.S.C. § 707(b)(1) due to the totality of the circumstances under 11 U.S.C. § 707(b)(3)(B). The Court will suspend dismissal for 30 days for the Debtor to request conversion of this case to chapter 13.

Dated: *July 16, 2026*

s/ Mychal A. Bruggeman

Mychal A. Bruggeman
United States Bankruptcy Judge